Ronald Alan COOTS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–90–00401–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

March 12, 1992.

Allen Isbell, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Kimberly Aperauch Stelter, Kelly Siegler, Asst. Dist. Attys., Houston, for appellee.

Before TREVATHAN, C.J., and COHEN and O'CONNOR, JJ.

## OPINION

COHEN, Justice.

A jury found appellant guilty of aggravated robbery. After considering appellant's plea of true to two enhancements for aggravated assault and forgery, the jury assessed punishment at 70 years confinement. We reverse and remand.

Appellant contends the evidence was insufficient, the trial court erred in allowing the bailiff to testify after the rule had been invoked, and the trial court erred in admitting hearsay evidence that appellant had used a telephone number which the robber gave the victim the day before the robbery. We hold the evidence was sufficient, but harmful error occurred when the hearsay was admitted and when the bailiff testified. The bailiff's performance in this case raises serious concerns, as discussed below.

Although the evidence is plainly sufficient based on the victim's testimony

alone, we state it in detail because of its importance in ruling on the evidence points.

During the afternoon of September 12, 1989, Debra Charbonneau was approached outside her suburban Houston home by appellant and another unidentified man. They inquired about the possibility of doing yard work. Ms. Charbonneau produced a piece of paper, upon which appellant wrote "Turner Yard Work" and a telephone number to call if she wished to employ them. They talked about 10 minutes, during which Ms. Charbonneau observed appellant at distances as close as three feet.

About 3:00 p.m. the next day, appellant returned to the Charbonneau home. When Ms. Charbonneau answered the door, he drew a gun and forced his way into the house. Ms. Charbonneau surrendered her jewelry and her purse, and she was bound and gagged. She clearly saw her assailant at close range and undisguised during the robbery.

Ms. Charbonneau summoned Harris County constables immediately after the robbery. She described the robber as being about five feet, seven or eight inches tall, slender, weighing about 140 pounds, and having crowded front teeth. A composite illustration of the robber's facial features was prepared, but she was unsatisfied with the result. She met with investigators on September 22 to describe again the robber's facial features.

Investigators had meanwhile contacted a small business at the telephone number given Ms. Charbonneau by the robber. The owners, Mr. and Mrs. Evans, identified several people, including appellant, who had used their telephone number as a business reference. Officers eliminated the other individuals and focused on appellant. When Ms. Charbonneau met with investigators on September 22, she was shown two six-photo arrays. One displayed appellant with a mustache, the other with a full beard. She positively identified appellant in both arrays as her assailant, and testified later that his photograph was just as

she had initially described the robber to authorities. She subsequently picked out appellant at a lineup and identified him in court.

The State's strongest evidence was Charbonneau's repeated positive identifications. Appellant claimed alibi and misidentification. Appellant contends the person Charbonneau described was not him because he wore a mustache at the time of the robbery and the composite picture prepared by investigators had none. Appellant argues he is taller and heavier than the individual Charbonneau described. Appellant claims that on the day of the robbery, he was six feet, three inches in height and weighed 190 pounds. At trial, the parties stipulated to that height and 163 pounds. At the lineup, appellant measured six feet, one inch, and weighed 172 pounds. Appellant contends that no trier of fact could find him to be the person described by Charbonneau due to her inability, shortly after the offense, to describe his height and weight and to direct the creation of an accurate facial composite.

Charbonneau said the robber was in his thirties, had brown hair, a thin face, and "crowded" teeth. This accurately describes appellant. Charbonneau was never committed to the composite picture's accuracy. She was dissatisfied with it. Charbonneau is 5'2" tall, and during most of her conversation with appellant, he slouched and stood on porch steps beneath her, which could make him seem shorter. The arresting officer described appellant as being 5'8" or 5'9", suggesting that appellant appears shorter than his true height.

Appellant presented alibi evidence. At the time of the offense, he was on probation, supervised by Harris County authorities. He was required to wear an electronic monitor attached to an ankle bracelet that maintained constant radio contact with a telephone receiver in his home. There was evidence that the transmitter's signal would be broken if appellant moved more than 150 feet from his telephone, and such movement would be automatically reported

to authorities. A private service company administered the program and bore responsibility for reporting to county officials and for maintaining the monitoring devices. Two witnesses from the company testified that they put the bracelet on appellant on the morning of September 12, 1989, the day before the robbery; that it was working properly; that there was no report on September 12 between 10:58 a.m. and 7:39 p.m. or on September 13 at any time of appellant moving more than 150 feet from his house; that the bracelet could only be removed by being cut off; and that appellant's bracelet was intact. Appellant also presented two alibi witnesses, who testified they were with him at the time of the robbery helping him move a tractor within 150 feet of his house.

The State introduced evidence at trial that monitoring devices of the type used by appellant were not reliable, that the service rendered by the private contractor had been unsatisfactory, and that the contract with that service provider was discontinued. The State also introduced testimony the devices were easily removed by pliers.

Appellant also presented expert testimony by a handwriting analyst. After examining 18 handwriting exemplars, the expert concluded appellant could not have written the note given Ms. Charbonneau by the robber. That testimony was impeached on cross-examination when the State established that the expert had not witnessed the appellant's production of the exemplars.

In deciding sufficiency, we view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). Based on Charbonneau's testimony, the evidence is sufficient.

The first point of error is overruled.

The fourth point of error asserts the trial court erroneously overruled appel-

lant's hearsay objection to Deputy Smith's testimony. Smith testified that Mary Evans named appellant as a possible suspect and stated appellant had used her telephone number by giving it out to others. This evidence was significant because the robber had left Mrs. Evans' phone number with Charbonneau the day before the robbery. Evidence that appellant used Evans' phone number strongly supported Charbonneau's hotly contested identification of appellant as the person she met the day before the robbery and who robbed her the next day.

Deputy Smith testified that the robber's phone number belonged to Mary Evans. He told Mary Evans the complainant's description of the robber, in order to see if such a person was using Evans' phone and possibly giving out that phone number, as the robber did in this case.

The following testimony occurred:

Q: And after you asked Mr. and Mrs. Evans if they knew of anybody like this, did they give you any answers?

(Defense Attorney):

I object. Mary Evans is subpoenaed to come down to testify to that fact.

The Court: Hearsay.

(Prosecutor)

Judge, I just asked if they give any answers, not what they were.

The Court:

Alright. Sustained. I'm sorry. I'll overrule the objection.

Q: Were you given any answers, Deputy Smith?

A: Yes, Ma'am.

Q: Initially how many names were you given?

A: I was given 2 names initially.

Q: Did you check out those 2 names?

A: Yes ma'am, I did.

Q: What did you find out when you checked those 2 names?

A: One was in custody at that time. The other was on parole out of El Paso.

Q: Where was the first one in custody?

A: Harris County.

Q: Where was the second person on parole out of, if you remember?

A: Out of El Paso.

Q: El Paso?

A: Yes, Ma'am. I contacted the parole officer in El Paso.

Q: Did you check out whether or not the person that was in custody in Harris County was in custody at the time, the date of the aggravated robbery.

A: Yes, ma'am. He had been in custody for sometime.

Q: Did you ever hear from Mary or Fredrick Evans again?

A: I spoke to Mary Evans probably 3 or 4 different occasions over the telephone. And on another occasion she gave me a third name.

Q: Who called whom on that occasion?

A: I cannot recall it.

Q: The last time you talked to Ms. Evans, or the time we're speaking of right now, what was the name of the person that she gave you?

(Defense Attorney):

Your honor, I object. Mary Evans is subpoenaed to come here. I'd rather have that information directly from Mary Evans.

The Court:

Sustained.

Q: After you got the name from Mary Evans on this particular date what did you do, Deputy Smith?

A: After that time, I did some background work on a particular name and obtained a picture.

Q: And who was that picture of?

(Defense Attorney):

Your honor, I object. She's going around it. When ever she's trying to

prove up something, that's hearsay. I object to that.

The Court:

Overruled.

Q: Who was the picture of, Deputy Smith?

A: Ronald Coots.

After appellant cross-examined Deputy Smith, the State brought out the following testimony on redirect examination:

Q: Deputy Smith, after talking to Mary and Frederick Evans, did you learn whether or not this defendant had ever used their phone number?

A: Yes.

Q: For what reason?

(Defense attorney): Your Honor, let Mary Evans come in and testify to that.

The Court: Overruled.

Q: Go ahead Sir.

A: I understand that he (appellant) had used it as a reference number, also as supposedly a home number.

■ Neither Mr. nor Mrs. Evans testified at trial. Deputy Smith's testimony informed the jury that Mrs. Evans had named appellant as a possible suspect and had stated that appellant had used the same phone number as the robber. This is inadmissible back door hearsay.[1] *Schaffer v. State*, 777 S.W.2d 111, 113–15 (Tex.Crim. App.1989); *Cardenas v. State*, 787 S.W.2d 160, 161–62 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd); TEX.R.CRIM.EVID. 801(d). It was preserved by timely objection. This was a closely contested case with ample room for reasonable doubt. Mary Evans' hearsay statement was the only evidence linking appellant to the phone number the robber used. Not surprisingly, the prosecutor spoke of it in jury argument. The error was harmful. TEX.R.APP.P. 81(b)(2).

1. Deputy Smith later testified on direct examination that Mary Evans stated appellant had worked in landscaping. Appellant objected on hearsay grounds, and the court sustained the objection. Appellant did not request further relief. Therefore, that error is not preserved for review.

▮ The State contends Deputy Smith's testimony was not hearsay because it was not offered to prove the truth of the matter asserted. The State did not say that in the trial court. It offered the testimony without limitation, and the trial court admitted the testimony without limitation. The court gave no limiting instruction to the jury when Evans' statement was admitted, and it gave none in the jury charge. The State claims it was merely trying to show how Deputy Smith came to include appellant's picture in a photospread.[2] The jurors were never told this, and there was no reason for them to assume that evidence so incriminating had such an unimportant purpose.

▮ The State next contends that, upon cross-examination of Deputy Smith, appellant elicited numerous hearsay statements by Mary Evans; thus, the State reasons, it was entitled to bring out the rest of Evans' statements, under the rule of the optional completeness. TEX.R.CRIM.EVID. 107. We disagree. Appellant did not elicit any hearsay statements by Evans until after the trial judge admitted the above-quoted hearsay over appellant's objection. This is a not a case where the defendant opened the door and the State walked through it. This door was first opened by the State over appellant's objection, and appellant then tried to minimize the harm through cross-examination. The law allows that. *Valcarcel v. State*, 765 S.W.2d 412, 417–18 (Tex.Crim.App.1989) (cross-examination of a witness regarding evidence erroneously admitted over the objection does not waive the objection.) This distinguishes this case from those relied on by the State, *Jackson v. State*, 423 S.W.2d 322, 323 (Tex.Crim. App.1968), and *Martinez v. State*, 749 S.W.2d 556, 560 (Tex.App.—San Antonio 1988, no pet.).

Point of error four is sustained.

▮ We next discuss the conduct at trial of the bailiff, Michael Lindsey. The second point of error contends the court erred in allowing Lindsey to testify, over objection, as a rebuttal witnesss, in violation of the witness rule, TEX.R.CRIM.EVID. 613.

Lindsey gave vital testimony rebutting both the testimony of the alibi witnesses and that of the expert witnesses concerning the electronic monitor. Lindsey testified and performed a demonstration purporting to show that a similar bracelet could be removed easily, without cutting, by using pliers. This contradicted the testimony of the two defense witnesses that it could only be removed by cutting. Lindsey also testified that the two alibi witnesses, Jerry House and Craig Allison, had told him that when they helped appellant move the tractor at the time of the offense on September 13, 1989, they moved the tractor no more than 150 *yards* from his home. This impeached their testimony that they had stayed within 150 *feet* of appellant's house, and also impeached the expert testimony that the monitor was working properly and would register an alarm if appellant had moved more than 150 feet away. No other State's witness gave such testimony.

The State says that it did not have to exclude Lindsey from the courtroom because it did not plan to use his testimony until the defense presented evidence that the monitor could only be removed by cutting. Only then, the State contends, did it realize it needed Lindsey to testify how it could be easily removed. This argument has no merit.

It should have been obvious to the State before trial that appellant would rely on the electronic monitor to prove his alibi. The State put the monitor on appellant for the express purpose of knowing if he left his home, and its own records showed he did not. Moreover, appellant told the State in his opening statement at trial that he would present such evidence. The State knew then, if not before, that it would have

---

2. The evidence was not admissible for that purpose because there was no issue of probable cause before the jury. *Perez v. State*, 678 S.W.2d 85, 87 (Tex.Crim.App.1984); *Soliz v.* *State*, 794 S.W.2d 110, 112–13 (Tex.App.—Houston [1st Dist.] 1990, no pet.). Moreover, the evidence here was neither harmless, as in *Perez* and *Soliz*, nor waived, as in *Soliz*.

to respond to this evidence. The State chose Lindsey for this task, but, inexplicably, failed to exclude him from the courtroom after the rule was invoked.

■ The State should have promptly identified Lindsey as a witness when the rule was invoked. If it had, the trial court would have excluded him from the courtroom or held a hearing to see if an exception should be made. At the hearing, the State would have been required to show that Lindsey's presence was "essential." TEX.R.CRIM.EVID. 613; *see Aguilar v. State*, 739 S.W.2d 357, 358–59 (Tex.Crim.App. 1987); *Hendley v. State*, 783 S.W.2d 750, 752–53 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd). Given that the State knew the rule had been invoked, knew of Lindsey's importance as a witness concerning the monitor, failed to inform the trial court of that fact, and failed to show any excuse for not doing so, we hold that Lindsey should not have been allowed to testify. The error was obviously harmful because Lindsey heard and contradicted vital testimony of two critical defense witnesses concerning the monitor. *Aguilar*, 739 S.W.2d at 359–60; TEX.R.APP.P. 81(b)(2). In sustaining this point of error, we need not decide whether it was error to admit Lindsey's testimony rebutting the alibi defense. However, we discuss it below.

Point of error two is sustained.

There is more about the bailiff's conduct in this case that arouses our concern. Lindsey testified that he talked often during the trial to defense witnesses, defense attorneys, and police witnesses concerning the case. On one occasion, while the defense attorney was engaged in a bench conference, Lindsey approached appellant and requested and received a copy of the electronic monitor's report. He then read it, even though he claimed in his testimony that he had already read it once before. He testified he wanted to see "how they print." Lindsey testified that he questioned alibi witnesses House and Allison about the distance the tractor was moved.

This record strongly suggests that Lindsey was simultaneously acting as the State's investigator and the trial court's bailiff. This should stop at once. A bailiff has no business interviewing defense or State's witnesses in court. He has no business conversing with defendants during trial about their cases any time, and certainly not while their lawyers are diverted. He has no business obtaining from the defendant and reading important documents regarding the case, especially when, as here, those documents apparently came from the defense attorney's file. He has no business being the State's witness at the same time he is catering to jurors' personal needs.

■ There are many reasons why a bailiff mixing with the jury should not put himself in a position to be a key State's witness. First, it violates the United States Constitution. *Gonzales v. Beto*, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Ex parte Halford*, 536 S.W.2d 230, 232–33 (Tex.Crim.App.1976). Second, it violates Texas law. "If the person furnished by the sheriff is to be called as a witness in the case he may not serve as bailiff." TEX. CODE CRIM.P.ANN. art. 36.24 (Vernon 1981). One court has characterized this statute as "a specific prohibition regarding contact between law enforcement and jurors...." *Strickland v. State*, 784 S.W.2d 549, 553 (Tex.App.—Texarkana 1990, pet. ref'd). Third, using a bailiff as an investigator compromises the impartiality of the judiciary. Bailiffs are viewed by the public not as ordinary police, but as the trial court's security and representative with the jury. They are seen as agents of the judge, and should strive to protect the impartiality of the court. *Parker v. Gladden*, 385 U.S. 363, 365, 87 S.Ct. 468, 470–71, 17 L.Ed.2d 420 (1966). They should not use this special position to extract information from defendants and witnesses. Many people who would choose not to converse with a police officer, as is their right, will assume,

when in a courtroom, that they should talk to the trial judge's important assistant, the bailiff. The potential for abuse is obvious, and in this case, it was probably realized. If the State wishes to continue its investigation in the courtroom during trial, it should select someone other than the bailiff to do so.

Trial judges are well equipped to prevent situations like this. Once they realize the danger it poses, we are confident they will do so.

The judgment is reversed, and the cause is remanded.